IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1: 08cr0079 (JCC) |
| | ) | |
| KYLE DUSTIN FOGGO, | ) | |
| aka "DUSTY" FOGGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

# I.

## INTRODUCTION

At the time of his crime, defendant Foggo was one of the most powerful executives at the Central Intelligence Agency.  He used this position to execute a scheme to defraud our country that spanned several of the most important years in our nation's history.  As our country was fighting a war on terror and preparing to invade Iraq, Foggo was scheming to profit from these endeavors from behind the lines.  A lucrative private sector opportunity with his lifelong best friend, Brent Wilkes, led him to scheme to steer millions in CIA and CIA-related contracts to this future employer.  Throughout the scheme, Wilkes gave Foggo a taste of the life that awaited him by treating Foggo to lavish vacations and expensive meals.  Foggo further used his office for his own benefit by directing CIA subordinates to hire his mistress, despite her record of misconduct in a previous job.  And when a dedicated public servant questioned her performance, Foggo instigated that employee's removal – a favor for which he reminded his mistress to "thank me later (smile)."

Because the Court must assess the nature and circumstances of Foggo's crime, as well as his personal history and characteristics, both are analyzed extensively below.  The Court will see that, despite his effectiveness as an administrator, Foggo was never a truly honest public servant.  His charm and guile took him to the highest ranks of the Central Intelligence Agency, where he was finally exposed.  For his crime, which spanned more than three years, and for the public he deprived of his honest services when they needed them most, Foggo deserves to be imprisoned for over three years.

## II.

## STATEMENT OF FACTS[1]

### A.    The Defendant

From prestigious educational and professional opportunities to unflinching support from family and friends, Foggo had everything most could ever ask for.  He grew up in the San Diego, California area, where, as a teenager, he became friends with Brent Roger Wilkes.  Both completed Hilltop High School in 1972 and went on to San Diego State University.  They remained best friends throughout adulthood, with each serving as the other's best man and each naming his son after the other.  Foggo graduated from San Diego State with a Bachelor's of Arts degree in Criminal Justice in 1976.  He served as a police officer for three years in San Diego after graduating.   In 1982, he received a Master's degree in Public Administration from the University of Southern California. He began his career with the CIA that same year.  Throughout his career, he was able to see the world as a support officer at a variety of international stations.  In 1992, the CIA sponsored his enrollment at the Kennedy School for Government at Harvard University, where he received a second Master's degree in Public Administration in 1993.

From 1993 through 2005, he completed CIA ethics training eight times, and served two years as a Deputy Ethics official.  In July 2001, he took over as the Chief of Support at an Overseas Location of the CIA.  That Overseas Location procured materials and supplied them to numerous other government locations.  In November 2004, he was selected to serve as the CIA's Executive Director ("ExDir") -- then the third-highest ranking official at CIA.  (The position has since been eliminated).  In this capacity, Foggo ran the CIA's day-to-day operations.  In May 2006, Foggo was

---

[1] The Government has filed an Appendix ("Appx.") comprised of declarations, transcript excerpts, and exhibits in support of the facts set forth in this Sentencing Memorandum.

asked to resign from the CIA. He did, and to help him transition out of the CIA, he was allowed to remain a paid employee for months after his home and office were searched by federal investigators.

**B.     The Central Intelligence Agency**

> *We put Country first and Agency before self. Quiet patriotism is our hallmark . . . We uphold the highest standards of conduct. We seek and speak the truth . . . . We hold ourselves – and each other – to the highest standards. We embrace personal responsibility.*
> Central Intelligence Agency Core Values

The CIA was good to Foggo. It provided him the opportunity to be a part of America's chief intelligence agency, whose mission is to serve as the nation's first line of defense. To carry out this mission, it collects and analyzes information to assist decision-makers charged with protecting America's interests, and acts at the direction of the President to preempt threats or achieve U.S. policy objectives. Its core values are service, integrity, and excellence. The Agency is headed by a Director, who is nominated by the President and confirmed by the Senate, and who bears responsibility to coordinate the collection of national intelligence using human sources, evaluate intelligence related to the national security, and assist the President and the Director of National Intelligence. The Deputy Director is next in line at the Agency, and, prior to July 5, 2006, then came the Executive Director, who was responsible for managing the CIA on a daily basis.

**C.     The Scheme**

> *Beginning in or about December 2002, and continuing through in or about September 2006 . . . FOGGO devised . . . a scheme to defraud . . . the United States and its citizens of their right to [his] honest services . . . to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, fraud, and corruption . . . . [T]hrough direct and indirect instructions, FOGGO abused his supervisory positions with the CIA in order to cause the CIA to hire companies or individuals with whom FOGGO had a personal relationship.*
> Foggo guilty plea, September 29, 2008

By late 2002, Foggo had become the Chief of Support Operations at a crucial Overseas Location, with control over millions of dollars in government funds. He also had a high-level, high-

3

paying position with his best friend waiting for him, as well as a need for money and powerful contacts so he could pursue his plan to succeed Randall "Duke" Cunningham as one of San Diego's congressional representatives.[2]   All of these circumstances and the exigencies presented after September 11 put to the test Foggo's commitment to the CIA's core values and to his country.  He failed that test and seized the opportunity to abuse his CIA offices through a vast criminal scheme.

Although Foggo has admitted his execution of this years-long scheme, he seems unwilling to truly accept responsibility for its full scope.  Instead, in his Statement of Acceptance of Responsibility, he attempts to portray himself as having been "influenced" by Wilkes into a "lapse of judgment."  As set forth below, Foggo, not Wilkes, instigated the corrupt pursuit of every contract in this scheme.  And the sheer length of the scheme, over three years, belies Foggo's characterization of his crime as a mere "lapse" of judgment.

In spite of the fact that before the Court stands a man who spent years defrauding his country, facilitating immigration fraud,[3] and recommending a man with no experience to provide

---

[2]Appx. 12; 20-21; 52-53.  Foggo maintained these ambitions after becoming Executive Director, and was very specific that he was considering running for Congress only in San Diego, for Cunningham's seat, and not in Virginia or anywhere else in California.  Appx. 52-53.  Nowhere else, of course, could Foggo tap into the network and funding that his best friend Wilkes offered in San Diego.   As Foggo admitted to a confidant, Wilkes was to be a "key partner" in Foggo's Congressional plans.  Appx. 12.

[3]Motivated by money, Foggo wrote to Wilkes from the Overseas Location:

I met a very interesting guy here a few months ago.  Major [] money.  He has a son that ran into problems with INS.  Absolutly [sic] no crime stuff, just stupid 20-year old stuff.  We need someone up high in the INS food chain or it will not get fixed for 5-6 years.  If Ben is not with INS anymore, then maybe we can get [Congressman] Duke [Cunningham] to write a joint letter with Cong. Bono.  They have contacts with Bono and we could get a letter from her no question.  Do you think Duke would join?  It would be worth a little campaign help, I'm sure.

Appx. 73 (emphasis added).  Foggo would eventually enlist JC to write a letter falsely purporting to offer a job to this foreign national as a pretense for obtaining a visa.  Appx. 21-22; 75-76.  As explained below, the "major money" man with whom Foggo was seeking to curry favor would later

potentially life-saving equipment and services to his countrymen, Foggo insists upon portraying himself as a patriot.[4]  This is a self-image he cultivated throughout his scheme, and his ability to ascend up CIA ranks, despite a record of misconduct, demonstrates how good he was at deceiving others into believing him.  He also twisted this term in order to help perpetrate his scheme by repeatedly assuring others at the CIA of the patriotism of his co-schemers: Wilkes, JC, and his mistress ER – all of whom were helping facilitate Foggo's crime against the country.  For example, in thanking the CIA's Acting General Counsel for heeding his order to reverse the decision to reject his ER's employment application, Foggo remarked, "as I have shared with you – this allows me to close out another debt of honor . . . ."  Appx. 78.  The length and vastness of Foggo's scheme prove that he is no patriot.

### 1.     Contractor X

> *I have been throwing Millions at his company for about 18 months – and I'm thinking we should be able to leverage some Wilkes Group contacts.*
> Foggo e-mail to Wilkes, May 14, 2003 (Appx. 64)

The power and authority of his post at the Overseas Location allowed Foggo to begin diverting significant sums of money to Wilkes.  At the time, the biggest contractor at the Overseas Location in monetary terms was Contractor X.  Contractor X's annual work with the CIA had grown rapidly from hundreds of thousands to millions of dollars.  Appx. 9.  Foggo envisioned Wilkes, his future employer, emulating Contractor X's success.  Appx. 9.  In May 2003, six months after Wilkes

---

be integral to the first direct CIA contract Foggo would obtain for Wilkes's benefit.

[4]The notion that Foggo pled guilty to preserve national security secrets is belied by his repeated threats to disclose at the public trial entirely irrelevant classified information.  This Court rejected his claim that such information was material and necessary to his defense – the same claim he has raised to explain his attempts to conceal from the public at sentencing the extent of his misconduct– in denying his request for access to additional compartments of classified information. Instead of being truly remorseful and regretful about what he has done, Foggo appears to be still trying to manage his image and present himself as having pled guilty for some reason other than the insurmountable evidence that he spent years defrauding the country.

had reserved an executive office for Foggo in Wilkes's brand new corporate headquarters (Appx. 21), Foggo told Wilkes in an e-mail that he had been "throwing Millions" at Contractor X. Foggo promised that he could use his influence with Contractor X to leverage some business for Wilkes's company, which was in a different industry entirely from Contractor X's work in aviation.[5] Foggo promoted Wilkes to Contractor X as a valuable lobbyist, though Wilkes was not even a registered lobbyist, and his "lobbying" success was largely limited to bribing his local congressman, Representative Cunningham.

In just over six months, based on Foggo's recommendation, Contractor X hired Wilkes over more qualified firms and agreed to pay him $1.5 million for one year of lobbying services from this unregistered lobbyist. Appx. 48. On January 29, 2004, Contractor X wired to Wilkes his first quarterly payment of $375,000. In the months that followed, Wilkes and Foggo continued to plot ways to manipulate Contractor X. In one instance, Foggo gave Wilkes details about the progress of a secret contract on which Contractor X was already working, and asked "What else do you need from me?" Wilkes suggested that Foggo tell Contractor X that Wilkes played a role in structuring that contract because doing so "[d]oesn't cost you anymore but gives me a %." Appx. 66.

When Contractor X began to sense that he had been had, Foggo attempted to assuage him by invoking Wilkes's patriotism: "While you already know he is a personal friend – he is also a patriot who has continued to serve the cause of Freedom." Appx. 69. As more time passed, Contractor X's skepticism grew and his relationship with Wilkes soured. Still, Foggo sided with his best friend and future employer Wilkes instead of a longtime valued CIA contractor: "As you know I do have influence with [Contractor X] and know I could get him to listen," he offered Wilkes. "[T]hat said if this issue is beyond repair in your mind - I am now, have been in the past,

_____

[5] Wilkes's company, ADCS, Inc., converted paper documents into electronic form. Appx. 20.

and will continue to as long as I breath [sic] - be your partner...so what do you want me to do?" Appx. 71 (ellipses in original).

But Foggo could not hide the fact that Wilkes was doing absolutely nothing for Contractor X, despite being paid $125,000 per month. Eventually, the relationship fell apart. Still, the single $375,000 payment Wilkes received for doing nothing – except for lobbying his best friend – was enough to cover nearly $100,000 in trips that the Wilkes and Foggo families had taken together in the months leading up to Contractor X's payment.

### 2. Water Contract "Test-Bed"

> *I'll work the water thing with [ ] – but you sending a follow-up email is a good idea, I want to insure that B-connection is not forgotten...Group W is in this deal.*
> Foggo e-mail to Wilkes, September 9, 2003 (Appx. 80)

For his scheme's first contract from the CIA directly, Foggo started small: a purchase order for a pallet of bottled water for the Overseas Location where he was then the Chief of Support. Notwithstanding the modesty of this contract, it represents a stark demonstration of where the public ranked in Foggo's loyalties. Foggo had learned of a supplier – the man whose "major money" had motivated Foggo to orchestrate an immigration fraud – who could sell bottled water to the Overseas Location at a better price than it had been paying. Instead of passing the benefit directly to the CIA, however, Foggo inserted Wilkes as a middleman to carve a profit for himself out of the savings that would otherwise have been available to the Agency.

Tellingly, Foggo and Wilkes discussed the arrangements during a $88,000 Wilkes-hosted Scotland vacation for the Wilkes and Foggo families. In fact, in an e-mail bearing the subject line "Scotland & Cigars," Foggo assured Wilkes, "I'll work the water thing with ["major money" man] – but you sending a follow-up email is a good idea, I want to insure that B-connection is not forgotten...Group W is in this deal." Appx. 80.

Wilkes designated his nephew, JC, to handle the details of this water project, using the shell entity Archer Defense. Foggo told JC the price to offer, the specifications for delivery, and the name of the cheaper supplier he had found. Appx 21. In March 2004, Archer Defense caused a shipment of bottled water to be delivered to the overseas location. Appx. 22. Wilkes and JC marked up the cost of the bottled water by 60%. Appx. 47.

Though the payment on this specific contract was very modest, Foggo made it clear to the Contracting Officer at the Overseas Location that he viewed this transaction as a "test-bed," and that he envisioned using Archer Defense for much bigger water contracts in the future. Appx. 9. If realized, Foggo's vision could have led to thousands of dollars in monthly orders from Wilkes (Appx. 9) – all presumably with the same 60% profit margin.

### 3.    Procurement Contract

> *I'll need to brief you a bit on how we need to play this, but that needs to be face to face, before you meet my people.*
> Foggo e-mail to JC, January 7, 2004 (Appx. 82)

As it turned out, the water contract was a test-bed in more ways than one. Spurred by the ease with which Foggo could use JC and a shell entity in order to obtain a contract for Wilkes's benefit while concealing Wilkes's involvement, Foggo and Wilkes turned their sights to a more lucrative contract. The springboard for this contract was yet another Wilkes-sponsored trip: this time, a $30,000 Hawaiian holiday at the Sullivan Estate.

During their Hawaiian vacation and the weeks that followed, Foggo, Wilkes, and JC discussed the new contracting opportunity. Foggo told JC that he had found some extra money in his budget at the Overseas Location, and that he had asked his deputy to reserve some funds for him for a special project. Appx. 22. It turned out that the special project was funding Archer to develop a procurement system. With JC as their strawman, Foggo invited JC to come visit the Overseas

Location.  To perfect the deception, in an e-mail in which Foggo confirmed the fun he had had in Hawaii, Foggo advised JC that he would "need to brief you a bit on how we need to play this, but that needs to be face to face, before you meet my people."  Appx. 82.

The way Foggo wanted "to play this" was to conceal Foggo's relationship with Wilkes and Wilkes's relationship to the contract.  When JC casually mentioned to a security officer at the Overseas Location that he had known Foggo all of his life, Foggo grew upset and made clear that JC should not tell his subordinates about their personal relationship, but instead, he should say that they had met for the first time in a cigar bar in Washington, D.C.  Appx. 22-23.  Foggo contrived this story to throw honest public servants off the trail of his scheme with Wilkes.  Later, over drinks at Foggo's home, Foggo warned JC, in essence: "You understand that this can't come back to Brent and me."  Appx. 23.  To ensure that their meaning was clear, Wilkes added, "But they don't care who you subcontract with."  Appx. 23.  Eventually, instead of continuing with Archer Defense, Inc., Wilkes had JC incorporate a new entity, Archer Logistics, Inc., on July 29, 2004 as a corporate layer between Wilkes and Foggo.  Appx, 23.  Although JC was named in corporate documents as the head of Archer Logistics, Wilkes was the true contracting entity.  Appx. 84-89.[6]

As for "his people," Foggo made clear to his staff at the Overseas Location that he had an interest in the Archer contract and wanted to see it supported.  He never disclosed his personal relationship with JC or Wilkes's interest in the contract.  Appx. 10; 51.  He instructed a subordinate to "check and push [the procurement contract] along to insure completion."  Appx. 92.  When Wilkes asked JC to get an advance payment on the contract because ADCS was struggling

---

[6] This deception was an integral part of the scheme, for the honest public servants who became involved with this contract would have refused to proceed and even reported Foggo to the Inspector General if they had known of Foggo's relationship with Wilkes and Wilkes's involvement in this contract.  Appx. 10; 51.

financially at the time, Foggo responded, "I can help with that. I'll work it." Appx. 91. With Wilkes, Foggo was true to his word, and two months after Wilkes created Archer Logistics, the CIA granted it a $1,699,904 contract to provide goods to the Overseas Location, with an $850,000 advance payment. This sum amounted to over $1,000 per order, and each order merely involved purchasing, and arranging to be shipped, ordinary retail items from vendors such as WalMart, Lowes, and Amazon.com. Appx. 50. The government paid for the cost of the goods and the shipping – beyond the $1.69 million Archer received for that service. Appx. 24-25; 50.

Three days after the contract was awarded, the CIA wired the $850,000 advance payment to Archer. Appx. 25; 95-96. The following day, Archer transferred $555,000 to ADCS. Appx. 25; 99. This pattern continued over the course of the contract – Wilkes simply directed JC when and how much money to transfer from Archer to Wilkes. Appx. 25-26.

Even after Foggo had left the Overseas Location to assume the Executive Director's post, he continued to advocate for Archer Logistics with officers at the Overseas Location. Archer's performance was inconsistent, and its high cost concerned the new contracting officer. Appx. 50. Foggo, however, insisted, "[J.C.] can be negotiated with – he has a real patriotic streak in him." Appx. 51; 69. Due largely to Foggo's influence and the press of time, the CIA granted Archer a six-month extension for $740,299. Appx. 50.

Prior to the expiration of Archer's extension, CIA contracting officials opened the contract up to competitive bids. Although Archer Logistics submitted a bid, a one-year procurement contract was awarded to another company for $382,223. Appx. 52. The contractor who won this competitively bid contract described its fulfillment as so simple, he could have done it "out of my garage with three people." Appx. 52. For 18 months of such a service, Foggo caused the CIA to pay Wilkes and JC nearly $2.5 million.

### 4.    Clandestine Air Support and Enhanced Capability

*I spoke with Brent Wilkes over the weekend and he reports that things seem to be well with your troops. He remarked that you may need to clear him and his attorney, do you need some ExDir grease to help get them to the top of the list?*

Foggo e-mail to Chief of CIA's SAD, June 20, 2005  (Appx. 105)

Foggo's efforts to ensure the prosperity of his future employer, Wilkes, culminated with his efforts to steer to Wilkes multi-million-dollar contracts for CIA aviation support services in two areas: to provide cover for its air operations and to implement an Enhanced Capability. As set forth above, Foggo had seen how valuable aviation contracts were for Contractor X, and he was determined to obtain the same for himself and Wilkes. The contracts for these particular functions were potentially worth tens of millions of dollars, and Foggo directed that his subordinates pursue Wilkes for both needs.

Just as he had provided insider information to allow Wilkes to profit from the water and procurement contracts, Foggo gave Wilkes six-months' advance notice on the CIA's likely need for air services. Appx. 27. Recognizing that JC and Wilkes had no experience in this area, Foggo offered to suggest personnel that JC could hire to help him start up and operate an aviation company. Appx. 27. Immediately after this visit, JC discussed the opportunity with Wilkes. Wilkes hired two consultants in San Diego to start working on the opportunity. Appx. 27.

In June 2005, Foggo introduced Wilkes to senior leaders at CIA headquarters as someone who had an extensive corporate portfolio that included experience in aviation, and for that reason could assist the CIA's Special Activities Division ("SAD"). Appx. 1. In reality, with the head-start given by Foggo, Wilkes had had six months to get up to speed on the ins and outs of operating an aviation company. In the days and weeks that followed, Wilkes presented various proposals to supply cover for the CIA's air operations, one of which had an estimated cost of $132 million.

11

Appx. 1.  The experts within SAD found Wilkes's proposals to be unwieldy, cumbersome, and lacking a real understanding of what the Agency needed.  Appx. 1-2.  Nevertheless, Foggo continued to push for Wilkes, offering to use his influence as Executive Director ("ExDir grease") to send Wilkes and his attorney  "to the top of the list" for security clearances – which would have placed them ahead of Arabic language linguists, operations agents, and other vital contractors and employees.  Appx. 121.  Foggo's plan was working, and by mid-summer 2005, SAD was already expecting a bill from Wilkes's lawyers that would be in the millions.  Appx. 48.

Foggo also met with other personnel in June 2005 to discuss the CIA's need for an Enhanced Capability for its air operations.  Foggo mentioned in the meeting that he had a friend who ran aviation companies, who could provide cover for the Enhanced Capability.  Appx. 52.  Foggo gave the impression that the idea of using this friend  had just occurred to him.  Appx. 52.  By the end of the meeting, Foggo had decided to go forward with an air-based implementation of the Enhanced Capability.  Foggo's decision meant that Wilkes would be used for the program.  None of the employees who had been working on this project supported the choice Foggo made – they had recommended a different option – but recognizing that a decision had been made by their superior, they "saluted" and carried out Foggo's order.  Appx. 2.  They estimated the costs of Foggo's plan with Wilkes (over and above the cover proposal Wilkes had pitched) to be approximately $40 million. Throughout June, July and into August, employees spent hundreds of hours moving forward with Foggo's directive to implement the Enhanced Capability using Wilkes.  Appx. 2.

Ironically, it was Wilkes's corrupt relationship with Cunningham that finally derailed this aspect of Foggo's corrupt scheme.  After the government executed search warrants on ADCS's corporate offices in San Diego and Chantilly, Employees in the SAD  were "greatly relieved" to learn that the Agency would no longer be using Wilkes.  Appx. 2-3.

### 5.    Additional Opportunities Pursued for Wilkes

#### a.    Security Contracting

> *The time has come for me to step back and allow you to meet and*
> *explore if in fact you could help each other make some money, and*
> *help the cause of freedom. I wish you all well.*
> Foggo email to JC and security firm, June 16, 2004 (Appx. 107)

At the same time he was pushing Archer Logistics on his subordinates for the procurement contract, Foggo was laying the ground work for another opportunity for Wilkes, in yet another industry in which Wilkes had absolutely no experience. Foggo tried to broker a joint venture between Archer and one of Foggo's foreign contacts, a private security firm called the Universe Security Group. Much like the water deal, Foggo explained that JC would simply need to serve as a middleman for a government contract that could be subcontracted to the security firm to provide the services. Appx. 26. After laying the foundation for what he hoped to be another profit center for his future employer, Foggo sent an e-mail to JC and the security company encouraging them to "help each other make some money, and help the cause of freedom." Appx. 107. As JC had no experience in the industry, and Archer was busy with the procurement contract and other Wilkes-Foggo business, he never actively pursued this invitation. Appx. 26.

#### b.    "Brokering" Wilkes's SCIF

> *Is that SCIF space in the Virginia office still available? How big is*
> *it? How much do you guys want for it? I may have a client in my*
> *Hqs who could use it. Let me know soonest and I'll broker it for you.*
> Foggo, e-mail to JC, February 5, 2004 (Appx. 109)

Another example of Foggo, not Wilkes, initiating the pursuit of a corrupt contracting opportunity involved a Specialized Compartmented Information Facility ("SCIF") in Wilkes's east coast headquarters. In a February 2004 e-mail to one of Wilkes's personal assistants, Foggo offered to serve as Wilkes's broker: "Is that SCIF space in the Virginia office still available? How big is

it?  How much do you guys want for it?  I may have a client in my Hqs. who could use it.  Let me know soonest and I'll broker it for you."  Appx. 109.

Foggo was not able to successfully "broker" a deal for Wilkes while stationed overseas in early 2004, but he was a far more powerful broker for Wilkes when he returned to CIA Headquarters as Executive Director.  In the summer of 2005, Foggo directed one of his subordinates to visit Wilkes's SCIF space.  Once again, Foggo used the "Archer" shell to conceal Wilkes's direct connection.  Foggo's subordinate understood that the Executive Director "definitely wants us to use the [Archer] space" so "unless the Archer space is entirely unsuitable, it looks like we won't be able to move on the [alternative] space."  Appx. 111.

Eventually, Foggo's subordinate referred Archer's SCIF space to another CIA employee, noting that Foggo was "keen to work with the company that is providing the space, Archer Logistics. Archer was very helpful to [Overseas Location] operations, and Dusty things [sic] that partnership can be expanded back here.  He'll probably give you a call."  Appx. 113.  Like the pending air cover contracts, these efforts came to a halt following the August 2005 searches of Wilkes's companies.

### c.    Armored Vehicles

While he was pushing SAD subordinates to contract with Wilkes for vital aviation services (with which Wilkes had no experience), Foggo was pushing others to contract with Wilkes's strawman (JC) for potentially life-saving armored vehicles (with which Wilkes and JC had no experience).  Just before Wilkes presented his air proposal to senior CIA staff, Foggo discussed with JC the proposal to supply armored vehicles to the CIA.  Foggo put JC in touch with an Agency subordinate in charge of procuring armored vehicles at the Overseas Location, and acted as a go-between for JC and the employee.  Appx. 48.

### 6.    Hiring His Mistress

*I always wondered how many times you get hit on?  You are smart, very witty*
*athlitic [sic], and (ahem) very attractive...'Nuff said :-)*
        Foggo e-mail to ER, August 16, 2004 (Appx. 47)

As he executed his scheme, Foggo realized some of its benefits through the many expensive

meals, gifts, and vacations Wilkes provided, but these were really just perks to tide over Foggo.  His

greatest monetary rewards would have to wait until after he had built up Wilkes's empire and joined

it – officially.  In the meantime, Foggo sought a more immediate payoff – and a more personal

benefit – from his scheme.  Since at least mid-2004, Foggo had had his eyes on ER, a woman he met

at the Overseas Location.  When Foggo returned to Headquarters in November 2004, his family

remained overseas.  With his family far away, he moved quickly to bring ER much closer by

recruiting her to the CIA.  Appx. 115.  Foggo brought ER to headquarters in November 2004 and

introduced her to several officials, effectively endorsing her as a candidate for employment.  Appx.

163-64.  Shortly thereafter, ER applied for a position with the CIA's Office of General Counsel

("OGC").  She was interviewed later that month.

As CIA hiring officials began to investigate ER's background, however, they learned of

problems in her previous government employment that precluded her from employment with the

CIA: she had engaged in improper conduct with a superior and had impeded the Inspector General's

investigation of the conduct by destroying evidence.  As a result, on or about February 28, 2005, a

CIA official sent ER a rejection letter.  Appx. 117.

In the meantime, Foggo had arranged for his family to remain overseas – at the public's

expense (Appx. 16-17) – and his relationship with ER had become sexual in nature.  Appx. 39-40.

The rejection of her employment application infuriated Foggo.  He summoned the Managing

Associate General Counsel (the "MAGC"), to his office, where Foggo insisted that ER was vital to

the mission at the Overseas Location,[7] and that, as the Executive Director of the CIA, his interest in hiring ER overrode the decision of OGC. Appx. 117. When the MAGC raised his concerns about the Inspector General's report regarding ER's conduct, Foggo twice warned him to be careful how he referred to ER. Appx. 118.

Far from debunking the IG's report of ER's conduct, Foggo was actively engaged in the same type of relationship with her. Nevertheless, Foggo forced OGC to hire ER. Appx. 35-37. After OGC relented, Foggo pressured CIA employees to expedite the completion of ER's vetting, including having her paperwork tagged as an "ExDir Interest." Appx. 121-23.

ER began her employment with the OGC's Administrative Law Division in July 2005.[8] Although she was new to the Agency, ER made very little effort to perform the work required of her at an acceptable level. She resisted her supervisor's feedback and outright refused requests that she redo work that was sub-par. Instead of being receptive to her supervisor's critiques and suggestions, ER made it clear that she had influence with Foggo. Appx. 18. Indeed, she did. Her supervisor had been an attorney with the OGC for 20 years, during which time she received numerous performance awards and even the Career Intelligence Medal, which rewards "exceptional achievements that substantially contributed to the mission of the Agency" over the course of a career. Appx. 16. Within a month of crossing Foggo's mistress, however, she suffered a humiliating firing by Foggo. Appx. 19. Foggo took credit, reminding ER that she could thank him later. Appx. 125.

---

[7] ER herself has acknowledged the falsity of Foggo's claim, in that she had "absolutely no involvement whatsoever" in helping the CIA's mission at the Overseas Location. Appx. 42.

[8] ER's position with the CIA resulted in an increase in pay of more than $30,000 over what she had been paid in her prior government position. Appx. 47.

16

### D.    Benefits

*We'll fly right to SD and spend the first week, Then we'll blast to Hawaii circa 19/20*
*Dec rent a place for the week and await Clan Wilkes for circa 27 Dec. - 3 Jan.*
Foggo e-mail to Wilkes, July 4, 2003 (Appx. 127)

Throughout his scheme, Foggo enjoyed lavish vacations, extravagant meals, and expensive gifts from Wilkes, or JC on Wilkes's behalf.  These shared events were not simply incidental to the criminal scheme or an outflow of their friendship.  Rather, the meals and vacations provided opportunities for Wilkes and Foggo – who throughout the scheme lived thousand of miles apart – to plan the scheme, discuss new opportunities to exploit, and implement its steps.  The close link between the vacations and Foggo's and Wilkes's criminal conduct is reflected in the evidence.

After Wilkes paid over $88,000 for vacation in Scotland for the Wilkes and Foggo families, Foggo sent Wilkes an email titled "Scotland and Cigars," reassuring him, "I want to insure that B-connection is not forgotten ....Group W is in this deal."  Appx. 80.  That trip cost Wilkes $12,000 in private jet flights; over $4,000 for a helicopter ride for Foggo and Wilkes to play a round of golf at Carnoustie; over $1,400 for a private bag-piper, magician, Scottish dancers, and band; $400 in tickets to the Lion King musical; and over $44,000 for a stay at the Pitcastle estate, which offered trout fishing on hill lochs, salmon fishing on the River Tay, clay pigeon shooting, archery, and a seven-person staff.   Appx. 44.

Similarly, after a $36,000 Hawaiian vacation paid for by Wilkes, Foggo sent co-schemer JC an e-mail entitled "Aloha," inviting the "'President'" of Archer to come visit.  Appx. 82.  It is clear that during $500 in golfing, nearly $1,000 in meals, and a $32,746 stay at the Sullivan Estate, a 5.2 acre luxury property at the North Shore in Oahu (Appx. 44), Wilkes and Foggo had a chance to discuss using Archer as the "straw company" to disguise their relationship.

Foggo often used extravagant meals (paid for by Wilkes) to introduce his contacts to Wilkes.

17

In June 2003, after Foggo promised Wilkes that he would "leverage some Wilkes Group contacts" from Contractor X, to whom he had been "throwing Millions," Foggo first introduced Wilkes to Contractor X at the Capital Grille. Wilkes paid $1,724 for the meal. On January 27, 2004, Foggo hosted Wilkes, JC and Contractor X at CIA headquarters. The next day, Contractor X entered into a contract with Wilkes, and that night Wilkes treated Foggo to a $1,195 meal. Appx. 59.

Wilkes also treated Foggo to dinner around each of the meetings Foggo set up for him at CIA headquarters so he could solicit the air services business. On June 6, 2005, they dined at the Capital Grille, on June 15, 2005, they ate at Damon's Grill, and on June 16, 2005 they returned to the Capital Grille. Wilkes paid for all of these meals. Appx. 60.

The benefits Foggo received were not limited to meals and vacations. He also received a $2,300 cigar humidor and a free round-trip international business-class airline ticket for his wife to visit from the Overseas Location in June 2005. Appx. 29; 45. None of these benefits were disclosed as required by government regulations.[9]

## E.    No Mere "Lapse" in Judgment "Influenced" by Wilkes

As has been shown, Foggo, not Wilkes, orchestrated this scheme, which far transcends any sort of transitory "lapse" of judgment. Foggo's independent misconduct and deceptiveness long predated this scheme and are relevant to an assessment of his personal history and characteristics.

---

[9] Throughout the scheme, which Foggo has admitted ran from 2002 to 2006, Foggo continued to complete government-mandated SF-278 Financial Disclosure Forms designed to identify and address just the kind of conflicts of interest and abuse of office he perpetrated. During this time, Foggo had an offer of a "high-level, high-paying position in Wilkes's companies," and he received tens of thousands of dollars worth of vacations, meals, and gifts. But Foggo concealed on SF-278 forms his standing offer of employment and all the benefits he received throughout his execution of the scheme. Beyond passively failing to disclose benefits on his annual forms, however, Foggo actively lied to Agency employees. When suspicions arose, he repeatedly denied to a close confidant that he knew of any connection between JC's Archer contract and Wilkes. Only after this confidant uncovered evidence to the contrary did Foggo change his statement – still refusing to confirm that he did anything wrong, but simply insisting, "No one can prove anything." Appx. 13-14.

### 1.    Pre-Offense Misconduct Unrelated to Wilkes

> *Thus far, the picture painted of Mr. Foggo is one of glad-hander,*
> *who takes a very liberal and self serving position regarding the*
> *interpretation of Agency rules and regulations.*
> CIA Reinvestigations Branch Memo, September 19, 1989 (Appx. 139)

Twenty years ago, long before he and Wilkes would execute this scheme, incidents of a very different sort demonstrated that Foggo was self-motivated when it came to breaking the law, violating policies, and lying to conceal such misconduct.

In 1989, while stationed overseas, Foggo stopped his car in front of bicycle bypass.  One frustrated passing cyclist slapped the trunk of Foggo's car.  After the two exchanged words, Foggo responded by knocking him off his bike and punching him in the face.  Then, much as he would later lie to others at the CIA about the "cigar bar" cover story for him and JC, Foggo concocted a story that local police officers had fabricated the entire incident as payback for Foggo's having spurned their efforts to solicit a bribe from him.  Foggo's superiors and the local officials considered his explanation to be "unrealistic and implausible."  Foggo's chief of station was convinced that Foggo was lying to him.  Appx. 5-6.  Foggo's assault on one of its citizens so outraged that nation that officials there filed a Diplomatic Protest with the U.S. Ambassador.  Appx. 5.

During this same overseas assignment, Foggo foreshadowed other aspects of his future criminal conduct.  For obvious reasons, the CIA's regulations requires its overseas employees to report "close and continuing" contacts with foreign nationals.  As the Chief of Support at that location, representing the Agency's administrative arm, Foggo bore particular knowledge and responsibility for promulgating the Agency's regulations.  Nevertheless, the CIA had to initiate an investigation into Foggo's undisclosed contacts with foreign nationals.  Appx. 6-7.  Foggo's responses to this investigation raised "[m]any more questions than answers," as it became clear that he had "withheld information concerning his relationship[s]" with multiple foreign women with

whom he was romantically involved.  Appx. 139.

Though crediting Foggo's "reputation as a can-do administrator" and acknowledging his "high performance appraisals," the investigator reached the following prescient conclusion: "Mr. Foggo's selective compliance with Agency rules and regulations, and unique interpretation of those rules vis-a-vis his 'three drop' rule, is an indication that he is likely to remain a potential threat to security through his poor judgment."  Appx. 144.  Similarly, although Foggo's supervisor at that time "recognized that Mr. Foggo was talented at his job as a Chief of Support, and [] recommended him for continued employment with the Agency," he also "knew Mr. Foggo was a person who was seriously flawed, ethically and morally, who would cut corners to achieve his aims."  Appx. 7.  He viewed Foggo as "a charming" and "glib" "people person," who had the ability to win people over. Appx. 7.  Nevertheless, Foggo's former chief was shocked when Foggo reached the CIA's highest ranks: "I was flabbergasted when Mr. Foggo was selected as the Executive Director.  I found Director Goss's selection to be quite revealing, that Mr. Goss would be taken in by a 'con man' like Mr. Foggo."  Appx. 7.  While Foggo's ascension may have been shocking, his crime was not: "I was not surprised when I learned of his guilty plea."  Appx. 7.

### 2.    Pre-Offense Misconduct Related to Wilkes

> [L]odging receipt has been lost.  I hereby acknowledge that the
> above amount is true and accurate.
>                 Foggo reimbursement request, Sept. 28, 2001 (Appx. 147)

Foggo's Wilkes-related misconduct even predated the criminal scheme that has brought him before this Court.  Despite two years as a Deputy Ethics officer for the CIA, including as a reviewer of SF-278 Public Disclosure Forms, one of the hallmarks of his scheme was his concealment of benefits he received from Wilkes from his own SF-278s.  Foggo began this unlawful conduct nearly two years before the start of the scheme, however.  In 2000, Wilkes treated Foggo to a $4,074 trip

to Hawaii. Appx. 46. In his SF-278 for that year, Foggo concealed this benefit, despite a clear obligation to disclose it. Appx. 149-155. In 2001, Wilkes treated Foggo and his family to a vacation to Orlando and New York City. Wilkes paid $43,854 for both families. Appx. 46. In his SF-278 for that year, Foggo concealed this benefit, despite a clear obligation to disclose it. Appx. 157-161. Foggo even requested, and received, $750 in reimbursement from the CIA for hotel lodging for which Wilkes paid, claiming that he had lost his receipt. Appx. 46. He confided in a longtime friend that he knew he should have disclosed his vacations with Wilkes on his ethics forms. Appx. 15.

Wilkes did not sign Foggo's fraudulent SF-278s or his fraudulent reimbursement request. At most, Wilkes's "influence" as to these matters was limited to being a willing participant in criminal conduct that Foggo himself instigated. As shown, the same holds true for Wilkes's "influence" throughout Foggo's execution of his criminal scheme.

### III.

### GUIDELINES CALCULATIONS

Foggo pleaded guilty to committing Honest Services Wire Fraud, in violation of 18 U.S.C. § 1343. Pursuant to the United States Sentencing Guidelines (2008) ("Guidelines" or "USSG"), parties agree the base offense level for this crime is 14, because Foggo was a public official at the time he committed his offense. *See* USSG § 2C1.1(a)(1), Statement of Facts, ¶¶1, 2.

### A.    High-Level Position

Not only the identity of the defendant, but the type of position he held is important in determining the appropriate sentence for an honest services scheme. An additional four levels is added to Foggo's base offense level because he was a public official in a "high-level decision-

making or sensitive position."  USSG § 2C1.1((b)(3).[10]

**B.     Value / Benefit / Loss**

The Guidelines provide for an increase in the base offense level according to the greatest of four measures: (1) the value of the payment; (2) the benefit received or to be received [by the co-schemers] in return for the payment; (3) the value of anything obtained or to be obtained by a public official  or others acting with a public official; or (4) the loss to the government from the offense. USSG § 2C1.1(b)(2).

**1.     Loss to the Government**

Here, there is no question that Foggo's scheme caused significant financial harm to the government, and it is equally clear that Foggo was indifferent to this consequence.  Nevertheless, the government maintains that such harm does not qualify as a loss under the Guidelines because, although Foggo could certainly foresee some financial harm, the reasonably foreseeable pecuniary harm resulting from this offense is not readily ascertainable.  *See* Plea Agreement ¶ 5(v); Govt's Objection to the PSR.  Indeed, the Guidelines do not account for the greatest harm here: the corruption of one of its most senior intelligence officials, who was entrusted with enormous power and concomitant responsibility to guard the nation's security and oversee the activities of thousands of public servants, many of whom were in harm's way.

But the Guidelines provision allowing for an increase based on "the value of anything obtained or to be obtained by a public official or others acting with a public official" certainly

---

[10]Foggo does not object to the PSR's recommendation that this enhancement be applied here, and it is amply justified in light of Foggo's positions during the scheme.  From July 2001 to November 2004, he was the "senior officer in charge of support operations" at an overseas location of the CIA, and in that position "directed the Overseas Location's daily operations supplying equipment to personnel overseas."  Subsequently, Foggo became "the Executive Director (then the third-highest position in the CIA), and as such directed the CIA's daily operations."  *See* Statement of Facts, ¶¶ 2, 3.  He "abused [these] supervisory positions with the CIA in order to cause the CIA to hire companies or individuals with whom [he] had a personal relationship."  *Id.*, ¶ 11.

applies.  Pursuant to the plea agreement, the government recommends a six-level enhancement to the offense level.  USSG § 2B1.1(b)(1)(E).  There are at least three sets of facts that support the government's request.

### 2.    Value of Anything Obtained or to Be Obtained by Foggo

As discussed above, the benefits Foggo received from Wilkes not only rewarded Foggo for his efforts, but they also helped facilitate the scheme by bringing Foggo and Wilkes together to orchestrate its details.  Over the course of the scheme, Foggo received approximately $60,597 in benefits from Wilkes, warranting a six-level increase.  Appx. 44.  Moreover, the value of anything "to be obtained" by Foggo must account for a reasonable estimate of the "high-level, high-paying position in Wilkes's companies" Foggo had waiting for him.  Such a job would have to have been valued at significantly more than the $162,000 salary Foggo was receiving from the CIA.  Even if a mere 20% increase is assumed, and only one year is counted, the value of this pay increase to be obtained by Foggo qualifies a six-level upward adjustment.

### 3.    Value of Anything Obtained or to Be Obtained by Others Acting with Foggo

#### a.    Wilkes

JC and Wilkes undeniably "acted with" Foggo to secure the procurement from the CIA.  As confirmed by the contractor who succeeded Archer, three employees and a garage were all the infrastructure needed to fulfill the Overseas Location's procurement needs.  For such minimal support, Wilkes had "charged" Archer hundreds of thousands of dollars by September 2005.  On September 8, 2005, Wilkes's shell entity (Archer) wired $60,000 to his parent company (ADCS, Inc.).  As of the time of this transfer, Wilkes had already received more than fair market value for all of the infrastructure he had and would provide throughout the initial procurement contract and six-month extension.  Appx. 26.  Therefore, the $60,000 transfer on September 8, 2005 was profit

for Wilkes – profit that resulted directly from Foggo's scheme. Appx. 26. This benefit to the man "acting with" Foggo fully supports the six-level increase recommended by the Government.

### b.    ER

ER had already been interviewed and rejected by the CIA's OGC when Foggo intervened, and forced the OGC to reverse this decision. She certainly "acted with" Foggo in the sense of concealing throughout the hiring process her ongoing romantic relationship with the CIA's Executive Director. Foggo's manipulation of his office and his subordinates, resulting in the hiring of ER, allowed him to secure the ready presence of his mistress, ensured that this mistress would have a substantial income of her own, and ensured for him a potential future spouse whose substantial income he could share – much as he anticipated his future salary with Wilkes. ER obtained a salary of $103,098 from the CIA, which represented a nearly 30% increase from her prior government salary, amounting to approximately $36,000 of additional pay by the end of September 2006. Appx. 47. Whether this pay increase is viewed as having been obtained by Foggo, or by another "acting with" him, it warrants the six-level enhancement the Government recommends.

## C.    Acceptance of Responsibility

In light of Foggo's narrowly phrased Statement of Acceptance of Responsibility, his counsel's characterization of the plea at the most recent court hearing in this matter, and his largely unfounded objections to the Presentence Investigation Report, the Government will reserve until the time of sentencing its position regarding whether Foggo is entitled to an adjustment for acceptance of responsibility. In doing so, the Government cautions Foggo to refrain from directly, or through statements of others, mischaracterizing the breadth of his scheme. *See* Plea Agreement ¶ 5(ii) (providing full credit for acceptance of responsibility only if Foggo "continues to manifest acceptance of responsibility as required under the guidelines for the charged acts as indicated in

Count 1"); *see also* USSG § 3E1.1, comment. (n.1(a)) (appropriate considerations for whether a defendant qualifies for acceptance of responsibility include "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any addition relevant conduct for which the defendant is accountable under § 1B1.3 . . . . a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility").

## D.    Downward Departure

The Government recommends a 2-level downward departure pursuant to § 5K2.0(a)(2) based on circumstances that are not otherwise adequately accounted for in the Guidelines, as provided in the plea agreement.  The Government contends that a 2-level departure based on Foggo's resignation, when asked to do so before searches of his home and office were executed and before criminal charges were brought, and his agreement to transfer venue from the Southern District of California to the Eastern District of Virginia, knowing that the transfer would expose him to broader criminal liability, sufficiently accounts for these unique circumstances.  The Government opposes any further departures.

## IV.

## STATUTORY SENTENCING FACTORS

Even though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220 (2005).  "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

The sentence imposed must meet a standard of reasonableness, *see Booker*, 543 U.S. at 765-66, and as the Fourth Circuit has stated, "reasonableness is not measured simply by whether the sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). A sentence imposed within the properly calculated Sentencing Guidelines range is presumptively reasonable. *Id.*

## A.     Nature and Circumstances of Offense [§3553(a)(1)]

Foggo devised and executed this scheme when our country was particularly susceptible to his tactics. Indeed, if the country could ever qualify as a "vulnerable victim," this would be the time. The exigencies of the war on terror and the invasion of Iraq, which were particularly acute at the CIA, would eventually serve to separate true public servants from opportunists. Into the latter group fell Foggo.

Beyond the timing of Foggo's scheme lies its duration and breadth. As detailed above, this was neither a fleeting lapse of judgment nor a narrowly tailored one. Foggo perpetrated this scheme for years. Throughout that time, he deceived all of his colleagues – from his subordinates at the Overseas Location all the way up to the CIA's Director (Appx. 32), and everyone in between. As set forth above, he determined how much money was left in the budget of a vital overseas station, and then coached Wilkes and JC so as to drain every last penny in order fill Wilkes's pockets. He overrode the judgment of operations experts regarding significant aviation matters for his own and his cohort's self-enrichment. He pursued a wide range of contracts for Wilkes involving crucial products and services with which Wilkes had no experience. He not only reversed the OGC's hiring decision concerning his mistress, he threatened its MAGC for raising concerns about ER's judgment and integrity at a time when Foggo and ER were actively confirming the soundness of those

26

concerns.  After ER was hired, he drove out of the CIA a decorated employee because she had attempted to hold Foggo to ethical standards and refused to accept subpar performance from a woman to whom the government was $100,000.

Because of Foggo, the CIA overpaid more than $2 million for procurement services. Although this financial harm does not qualify as a "loss" under the Guidelines, it is certainly a relevant component of the nature and circumstances of Foggo's offense.  A sentence at the high end of the Government's recommended Guidelines range would account for this harm.

**B.     History and Characteristics of Defendant [§3553(a)(1)]**

Stripped of his titles and the global stage on which his scheme unfolded, Foggo is revealed to be just what one of his first supervisors thought him to be: a con man.  Indeed, even Foggo's most prominent positive attributes – his charisma, his gregariousness, and his resourcefulness – are common to most con men.  To credit Foggo for such attributes or his years of employment at the CIA would be to credit him for the very means of his offense.

Of course, Foggo's conduct before and throughout his scheme reveal far more than what, under other circumstances, could be considered positive characteristics.  For it was narcissism – not patriotism – that drove his actions, narcissism and deceitfulness.  Foggo first displayed these traits at least 20 years ago, and he continued to demonstrate them throughout his scheme; they enabled him to obtain his final position of power.[11]  Similarly, the execution of Foggo's crime called for profound unfaithfulness.  Foggo repeatedly answered this call with his many betrayals of country,

---

[11]Porter Goss, the Director of the CIA who chose Foggo for the Executive Director position, was so concerned about the CIA's standing, he directly asked Foggo whether there was anything he needed to know that would reflect poorly on the Director's Office or the CIA.  Foggo could have simply withdrawn his name from consideration in order to avoid the risk of embarrassing the CIA and its Director.  Instead, Foggo advanced his career and his scheme by assuring Director Goss that he had nothing to disclose.  Appx. 32.  Had he known about Foggo's offenses at the Overseas Location, Director Goss would not have picked Foggo, and would have instead initiated the process to have Foggo terminated from government employment.  Appx. 32.

colleague, and family.[12]

Foggo's former supervisor, a man who knew Foggo for more than a decade before he began his scheme, provided a succinct assessment of Foggo's personal characteristics: "Mr. Foggo was a person who was seriously flawed, ethically and morally, who would cut corners to achieve his aims." Foggo's history and characteristics weigh heavily in favor of a high-end sentence.

## C.    Need for Sentence To Reflect Seriousness of Offense, Promote Respect for Law, Provide Just Punishment for the Offense, And Afford Adequate Deterrence [§ 3553(a)(2)]

The offense before the Court was committed at one of the most critical times in the CIA's history, and its perpetrator was the CIA's highest ranking member to ever be convicted of a crime. Add to these facts the details described above and it is apparent that this is a very serious offense. Although Foggo may improperly attempt to narrow the scope of his plea, he pled guilty to the entire scheme, which was comprised of many instances of serious misconduct over several years, demonstrating Foggo's lack of respect for the law.

It might be tempting for people in positions of power as high as Foggo's to believe they are above the law because of the many obstacles that stand between their corruption and the efforts to expose it. They are also aware, as was Foggo, of the money that their corruption can yield. In an ideal world, there would be no need to deter crime at these levels of government. But history has taught us that greater deterrence is needed to balance greater power. Likewise, the public needs to see a sentence in this case that is just when compared to the sentences that await other offenders whose crimes cause far more isolated harm than did Foggo's. Only a substantial sentence will reflect the seriousness of, and provide a just punishment for, Foggo's offense, promote respect for law, and

---

[12] Foggo asserts in his Statement of Acceptance of Responsibility that he "deeply regret[s]" "the pain and anguish my actions have caused my family." Much like his claim of being "influenced" by Wilkes, Foggo's actions over the course of many years belie his expression of concern for his family's feelings.

afford adequate deterrence to criminal conduct by the most powerful members of our society.

<strong>V.</strong>

<strong>RECOMMENDED SENTENCE</strong>

If Foggo qualifies for acceptance of responsibility, his adjusted offense level would be 19, with a Guidelines range of 30-37 months. If he does not qualify for acceptance of responsibility, his adjusted offense level would be 22, with a Guidelines range of 41-51 months. Under either scenario, in light of the Section 3553(a) factors discussed above, as well as the facts and circumstances outlined throughout this memorandum, the Government recommends that the Court impose a sentence at the high end of the applicable Guidelines range.

DANA BOENTE
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Valerie H. Chu
California Bar No. 241709
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Suite 6293
San Diego, CA 92101
(619) 557-7837
(619) 557-7055 (fax)
valerie.chu@usdoj.gov

By: _____/s/_____
Jason A. Forge
California Bar No. 181542
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Suite 6293
San Diego, CA 92101
(619) 557-7463
(619) 557-7055 (fax)
jason.forge@usdoj.gov

By:       /s/
        Phillip L.B. Halpern
        California Bar No. 133370
        Assistant United States Attorney
        United States Attorney's Office
        880 Front Street, Suite 6293
        San Diego, CA 92101
        (619) 557-5165
        (619) 557-7055 (fax)
        phillip.halpern@usdoj.gov

**CERTIFICATE OF SERVICE**

       I certify that on February 13, 2009, I caused to be hand-delivered and/or sent electronically the foregoing to a representative of the following:

Andrew Dober
Elizabeth Tobio
Nicole Springzen
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave NW
Washington, DC 20036
(202) 887-4000
bpotts@akingump.com
Counsel for defendant Kyle Dustin Foggo

_____/s/_____
Jason A. Forge
California Bar No. 181542
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Suite 6293
San Diego, CA 92101
(619) 557-7463
(619) 557-7055 (fax)
jason.forge@usdoj.gov
