**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | **Case No. 1:08-cr-00079-JCC** |
| Plaintiff | ) ) ) | |
| v. | ) ) ) | **SENTENCING MEMORANDUM ON BEHALF OF KYLE DUSTIN FOGGO** |
| KYLE DUSTIN FOGGO | ) ) ) | |
| Defendant. | ) ) ) ) ) | **FILED UNDER SEAL BY ORDER OF THE COURT** |

COMES NOW Defendant Kyle Dustin Foggo, by counsel, and respectfully submits this

sentencing memorandum and attached exhibits[1] for the Court's consideration.  The sentencing

hearing is scheduled for Thursday, February 19, 2009 at 10:00 a.m.

## <u>Introduction</u>

Mr. Foggo is a man who has committed his life to public service.  Mr. Foggo began his

career in public service as a police officer with the San Diego Police Department.  He was named

Police Officer of the Month and nominated for Police Officer of the Year in recognition of the

---

[1] Attached hereto as exhibits are the following:

Exhibit A consists of several letters from Mr. Foggo's family, friends, and colleagues.

Exhibit B is a Classified Exhibit, which describes, in more detail, Mr. Foggo's service to the United States.

Exhibit C is the procurement contract executed after the expiration of the Archer Logistics procurement contract (the "Subsequent Procurement Contract").

eighty-two percent drop in violent crime and property crimes on his beat.  Mr. Foggo then served as a detective with the Los Angeles Police Department.  Mr. Foggo was injured several times in the line of duty.

Much of Mr. Foggo's public service, however, was devoted to protecting matters of vital national security, and he was very good at his job.  His co-workers have praised him as being "devoted to the mission of the Agency," and as having a "laser focus on serving the mission and people of the CIA."  One long-time agency employee has described Mr. Foggo as the "gold standard" in his profession.  As a supervisor, Mr. Foggo inspired loyalty in his staff members and instilled in them a renewed dedication to their mission to serve the United States.  Furthermore, Mr. Foggo is a loving and devoted father, he was a thoughtful and caring son to his mother, and he is a loyal and generous friend.  This is the rich portrait of Mr. Foggo that emerges from the descriptions of him in the letters submitted to the Court on his behalf.  The letter writers, who range from neighborhood friends to family members to former colleagues, bear witness to Mr. Foggo's strength of character and significant contributions to this nation's security.  As detailed below, Mr. Foggo's twenty-four years of distinguished service to the Central Intelligence Agency ("CIA"), particularly in the months following the terrorist attacks of September 11, 2001, demonstrate his extraordinary commitment to public service.  His dedication to protecting our country, its allies, and our servicemen and servicewomen serving abroad is beyond question.

Mr. Foggo's commitment to service is also demonstrated through his acts of kindness and generosity towards those in his community.  As reflected in the letters submitted to the Court, Mr. Foggo spent countless hours over the past year or so providing comfort and support to the family of a young boy battling cancer.  The boy is the best friend of Mr. Foggo's son, and Mr.

Foggo made it a priority to visit him at the hospital and provide encouragement. Mr. Foggo also acted as a mentor to the son of one of his own friends. Finally, Mr. Foggo volunteered his time and reorganized the library at Bethesda Naval Hospital.

Pursuant to the sentencing factors set forth in 18 U.S.C. § 3553(a), Mr. Foggo respectfully requests that this Honorable Court impose a term of probation. For the reasons outlined below, a sentence including any incarceration would be "greater than necessary" to achieve the specified purposes of sentencing. *See* 18 U.S.C. § 3553(a); *United States v. Tucker*, 473 F.3d 556, 561 (4th Cir. 2007) (holding that a "district court's mandate is to impose a sentence *sufficient, but not greater than necessary,* to comply with the purposes of § 3553(a)"). Based on the unique facts of this case and Mr. Foggo's length of service to the United States, a sentence of probation is warranted pursuant to 18 U.S.C. § 3553(a).

## Discussion

Following *United States v. Booker*, 125 S. Ct. 738 (2005) the Court must impose a sentence in accordance with 18 U.S.C. § 3553(a), and should no longer presume that a sentence calculated pursuant to the United States Sentencing Guidelines is appropriate, mandatory or reasonable. *See Nelson v. United States*, 2009 U.S. LEXIS 872, *4 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."); *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."); *Gall v. United States*, 128 S. Ct. 586, 590 (2007) ("[T]he district judge should [ ] consider all of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence requested by a party."). The Supreme Court has persistently remanded and overruled circuits that place too much weight on the Guidelines and seem unwilling to consider <u>all</u> of the § 3553(a) factors post-*Booker*. *See*

3

*Nelson*, 2009 U.S. LEXIS 872; *Spears v. United States*, 2009 U.S. LEXIS 864 (U.S. Jan. 21,

2009); *Kimbrough v. United States*, 128 S. Ct. 558 (2007); *Gall*, 128 S. Ct. 586.  Indeed, the

correctly calculated Guidelines range is but <u>one</u> factor for the Court to consider in imposing a

sentence.  18 U.S.C. § 3553(a)(4).  Ultimately, however, it is the § 3553(a) factors, on the whole,

which justify a sentence.  *Gall*, 128 S. Ct. at 602 (affirming district court's reasoning "that the

§ 3553(a) factors, on the whole, justified the sentence"); *Kimbrough*, 128 S. Ct. at 570 (citations

omitted) (The federal sentencing statute "requires a court to give respectful consideration to the

Guidelines, [but] *Booker* 'permits the court to tailor the sentence in light of other [*§ 3553(a)*]

statutory concerns as well.'"); *United States v. Go*, 517 F.3d 216, 218 (4th Cir. 2008) (affirming

district court's decision that the "3553(a) factors, on a whole, justify the extent of the variance"

from the Guidelines range).

    Most significantly, the court must impose a sentence "sufficient, *but not greater than*

*necessary*" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2).  *See*

*also Kimbrough*, 128 S. Ct. at 570; *United States v. Tucker*, 473 F.3d 556, 561 (4th Cir. 2007).

Those purposes include the need to (1) "reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense"; (2) "afford adequate deterrence to

criminal conduct"; and (3) "protect the public from further crimes of the defendant."  18 U.S.C.

§ 3553(a)(2)(A), (B) and (C).

    Pursuant to § 3553(a), courts must also consider a number of other factors, including "the

nature and circumstances of the offense and the history and characteristics of the defendant";

"the kinds of sentences available"; the Guidelines; and "the need to avoid unwarranted sentence

disparities."  *Id*. at § 3553(a)(1), (3), (4), and (6).  Under this new sentencing regime, a court

should consider all the relevant sentencing factors, giving no more weight to one factor than to

4

any other factor.  The focus of the new regime is thus the imposition of a sentence that takes into account the whole person, rather than simply the calculation dictated by the numbers and grids of the Guidelines.

The Presentence Investigation Report (the "PSR") recommends a Guidelines range of 135-168 months.  As discussed more fully below, the probation officer's calculations are incorrect and most likely based on incorrect information and erroneous conclusions.  Full consideration of the other factors outlined in § 3553(a), including the fundamental command that the sentence be sufficient, but not greater than necessary to serve the purposes of the punishment, makes clear that a sentence of probation is warranted in this case.  Mr. Foggo respectfully requests that the Court sentence him on the basis of <u>all</u> the § 3553(a) factors rather than on a strict adherence to the Guidelines or the incomplete portrait of him presented in the PSR.

A.  <u>Mr. Foggo's Personal and Professional History Supports a Sentence of Probation Under 18 U.S.C. § 3553(a)(1)</u>

Pursuant to § 3553(a)(1), the Court must consider Mr. Foggo's "history and characteristics" when sentencing.  Mr. Foggo has submitted a large number of letters from a comprehensive cross-section of people who know him best, all attesting to his service to the United States, strength of character, and devotion to his family.  *See* Exhibit <u>A</u>.  The letter writers range from Mr. Foggo's colleagues, many of whom enjoyed decades-long careers at the CIA, to friends and neighbors, and even include his ex-wife, who praises his devotion to his job, his country, and his family.  Mr. Foggo has touched the lives of all of these people and their letters are powerful evidence of mitigation supporting a sentence of probation.

1.  <u>Mr. Foggo Has Made Great Contributions to the Public Interest and Has Served the United States With Distinction</u>

After receiving his undergraduate degree from San Diego State University in 1976, Mr.

5

Foggo accepted a position as a patrolman with the San Diego Police Department. Mr. Foggo also received a Master of Public Administration from the University of Southern California and a Master of Public Administration, with an emphasis on government operations, from the Kennedy School of Government at Harvard University.

In 1982, Mr. Foggo joined the CIA. For twenty-four (24) years, Mr. Foggo served the United States as an intelligence officer with honor and distinction, especially in the months following the terrorist attacks of September 11, 2001. Throughout his career at the CIA, Mr. Foggo served at various locations around the world and worked on highly classified programs not known to the public. Mr. Foggo ultimately relocated his family to an "Overseas Location" where he served as the senior CIA official in charge of support operations from July 2001 until November 2004. This was a critical time in the history of the CIA because it covered post-September 11, 2001 and the war in Iraq. Mr. Foggo's work at the Overseas Location, in particular, is so highly classified that a description of his responsibilities and significant achievements has been attached in a Classified Exhibit. *See* Exhibit B. What can be said is found in one of the letters written in support of Mr. Foggo by one of his colleagues: his "involved, sincere leadership transformed a small team of professional patriots into a team of hard-working energized men and women who once again had strong leadership and purpose." Another letter writer and long-time agency employee describes Mr. Foggo's time at the Overseas Location as "a shining moment for the CIA." Still another notes that "even today, methods of securely providing sensitive support originally developed and implemented by [Mr. Foggo] continue to serve" the CIA, as well as other government agencies.

Often placing himself in harm's way to determine the needs of field personnel, Mr. Foggo ensured the delivery of vital support to those serving on the front lines in sensitive and

dangerous assignments. His exemplary performance reviews and a medal in recognition of his accomplishments at the Overseas Location, indicate the valuable contributions Mr. Foggo made while serving the United States. Ultimately, the CIA promoted Mr. Foggo to the position of Executive Director, the third-highest position in the CIA. In this capacity, Mr. Foggo directed the CIA's daily operations from November 2004 until May 2006. Mr. Foggo's accomplishments, outstanding reviews, and his service to the United States accurately depict the history and characteristics of Mr. Foggo.

     2.   Mr. Foggo Is Devoted to His Family

Mr. Foggo's dedication to serving his country is surpassed only by his commitment to his family. He and his wife Brigitte have a daughter, Aimee, who is 17 years old and a son, Viktor, who is 14 years old. In honor of his beloved family members, both of his children were named after a grandparent – Aimee after Mr. Foggo's mother, and Viktor after Brigette Foggo's father. Mr. Foggo has been described by a letter writer as "the consummate proud father." Another letter writer states that "Mr. Foggo's character can be judged by the time and effort he devotes to his family." Another writes that Mr. Foggo's children "adore their father" and that although the past three years have been extremely difficult for them, "they maintain their positive attitude and respect for their father." Apart from being a devoted father, Mr. Foggo was a devoted son, bringing his elderly mother to live with his family for the final eight years of her life, until her death in September 2005 at the age of 91.

Unfortunately, the demands of the CIA often required Mr. Foggo to sacrifice time with his family. Serving his country would take him away from his family for months at a time, particularly after the September 11, 2001 attacks. While Mr. Foggo relocated his family to the Overseas Location, he spent countless hours away from those he loved most – his family. His

colleagues there were struck by the fact that Mr. Foggo loved to speak about his children, made time to take their phone calls, and spent time with them whenever the demands of his position allowed him to do so.

Mr. Foggo's family is devastated by the thought of him being separated from them again. In her letter to the Court, Brigitte writes, "I know I will miss Dusty most, not only because I love him but because he truly is my partner and I do count on him for so many things. He is my anchor here." His son, Viktor, wrote, "My dad has always been a good, honest hardworking man who has, is and hopefully will continue raising me and my sister to do the right thing and be responsible, especially throughout our high school years. I would try to tell you what would happen to our family if my dad wasn't around, but I can't imagine." Similarly, his daughter, Aimee, wrote, "The idea of not having [my dad] around to talk to, and to teach me and help me whenever I need him is almost impossible to think about."

B. The Nature and Circumstances of the Offense Supports a Sentence of Probation Under 18 U.S.C. § 3553(a)(1)

Under § 3553(a)(1), a judge must also analyze the "nature and circumstances" of the offense. We urge the Court to consider the Plea Agreement, Mr. Foggo's protection of matters of national security and Mr. Foggo's service to the United States when analyzing the unique nature and circumstances of Mr. Foggo's offense.

As the Court is aware, in September 2008, Mr. Foggo pled guilty to Count One, wire fraud, of the Second Superseding Indictment ("SSI"). Count One charged Mr. Foggo with "devising a scheme to defraud, including depriving the United States and its citizens of their right to his honest services, and to obtain money and property by means of false representations and concealment of material facts." *See* Plea Agreement at ¶ 1. Specifically, Count One is based

8

on an email Mr. Foggo sent on or about September 10, 2003, relating to the fraudulent procurement of a water contract for the benefit of a longtime friend, Brent Wilkes. *See* SSI at 7, 20. That water contract involved a single shipment in early 2004. The remaining counts (Counts 2 – 28) in the SSI were dismissed on motion of the government. *See* Plea Agreement at ¶ 4.

Mr. Foggo fully acknowledges that his conduct was wrong and accepts responsibility for his actions. Importantly, the nature of Mr. Foggo's offense is not related to the investigation of Congressman Randy "Duke" Cunningham, which ultimately led to the indictment of Brent Wilkes. Unlike Congressman Cunningham, Mr. Wilkes, and Mitchell Wade, Mr. Foggo was not charged with any crimes related to the Cunningham investigation. There is no evidence that Mr. Foggo played a role in the Cunningham conspiracy. Perhaps more importantly, there is no evidence that Mr. Foggo received any kickbacks from the Cunningham conspiracy. Moreover, at no time in this case has anyone claimed, including all of the government lawyers and agents, that Mr. Foggo received any kickbacks in the context of the alleged offenses.

The Plea Agreement accurately reflects the nature of Mr. Foggo's offense. It stipulates: (1) the "reasonable pecuniary harm [to the government] resulting from this offense is not readily ascertainable"; (2) the "value of any benefits received by [Mr. Foggo] resulting from this offense is less than $70,000"; and (3) that "[r]estitution is not applicable in this case." *See* Plea Agreement at ¶¶ 5v, 5vi and 2. More importantly, the Plea Agreement memorializes the government's agreement that the adjusted offense level should be no higher than 19, with a sentence no longer than 37 months. *See* Plea Agreement at ¶ 5.

However, the probation officer recommends an adjusted offense level of 33, with a sentencing range of 135-168 months. Clearly, the probation officer's calculations are not based on the offense conduct to which Mr. Foggo pled guilty. The PSR seemingly adopts every count

in the SSI, despite the government's dismissal of Counts 2 through 28. By including a lobbying contract to which the government was not a party, the procurement contract, and the allegations concerning E.R., the PSR deprives Mr. Foggo of the benefit of his plea agreement and arrives at an incorrect calculation of the sentencing range. Finally, the PSR's recommended Guidelines range of 135-168 months, is approximately 3.5 to 4.5 times longer than the upper limit of the sentencing range to which the government agreed in the Plea Agreement. For these reasons, Mr. Foggo believes the probation officer's view of the offense conduct is incorrect and inconsistent with the Plea Agreement and the Statement of Facts.

Nonetheless, Mr. Foggo acknowledges the circumstances that have led to the probation officer's incorrect and inconsistent calculations. Due to the highly-classified nature of this case, the probation officer was faced with certain hurdles that are not usually present in the standard criminal case. As a result, the probation officer was deprived of the benefit of assessing the evidence in its entirety and gaining a complete understanding of the charges Mr. Foggo faced and the charge to which he pled. For the purposes of preparing the PSR, the probation officer was granted a temporary security clearance that limited her access to documents that were classified at the "secret" level and below. As a result, Mr. Foggo was not able to make available to the probation officer highly-classified evidence that would have provided a more complete picture of his actions, as well as his responsibilities at the Overseas Location, and his accomplishments throughout his career at the CIA. Due to issues regarding the disclosure of classified information and time constraints, the probation officer did not have the benefit of reviewing all the evidence in the case. Consequently, the probation officer did not have an understanding of the offense conduct, nor did she understand all that went into the plea agreement. For this reason, Mr. Foggo urges the court to rely on the Plea Agreement and the

Statement of Facts when considering the nature and circumstances of the offense, and not the incomplete and distorted version of the offense as presented in the PSR.

C. Relevant Guideline Calculations Support a Sentence of Probation Under 18 U.S.C. § 3553(a)(4) and § 3553(b)

The probation officer's calculations are based on a misapplication of the Guidelines. However, the Guidelines are but one of the factors to consider under § 3553(a) when imposing a sentence. 18 U.S.C. § 3553(a)(4); 18 U.S.C. § 3553(b); *see also Gall*, 128 S. Ct. at 602. Although the Supreme Court declared the Guidelines advisory, we recognize that the Court is obligated to consult the Guidelines. *Nelson*, 2009 U.S. LEXIS 872, at *2 ("[T]he sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, *18 U.S.C. § 3553(a)*, explaining any variance from the former with reference to the latter."); *Gall*, 128 S. Ct. at 596 ("[T]he Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however."); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (In the wake of *Booker*, "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing,'" and then consider "those factors set forth in § 3553(a) before imposing the sentence.").

However, Mr. Foggo's circumstances present an "atypical case" that falls outside the "heartland" to which the United States Sentencing Commission intends each individual Guideline to apply.[2] 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0; *see also Rita*, 127 S. Ct. at 2461

---

[2]"Heartland" is defined as "a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt. A, § 4(b). Atypical cases are those "to which a particular guideline linguistically applies but where conduct significantly differs from the norm." *Id.*

11

(acknowledging defendant's alternate arguments that either: (1) within the Guidelines framework, a departure from the applicable range is warranted because the circumstances present an "atypical case" that falls outside the "heartland" to which the Guidelines apply or (2) independent of the Guidelines, application of the § 3553(a) sentencing factors warrants a lower sentence). In cases falling "outside the 'heartland,'" courts are afforded the greatest respect when varying from the Guidelines to craft an appropriate sentence. 18 U.S.C. § 3553(b); *Spears v United States*, 2009 U.S. LEXIS 864, at *4-5 (U.S. Jan. 21, 2009) ("[A] district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the "heartland" to which the Commission intends individual Guidelines to apply.'"); *Rita*, 127 S. Ct. at 2465 (same); *Kimbrough*, 128 S. Ct. at 574-75 (same).

As set forth more fully below and in the attached Classified Exhibit, Mr. Foggo's case is unique in ways the Guidelines did not contemplate. Mr Foggo's role in some of the most classified intelligence activities in the history of our nation, and his willingness to spare public litigation of issues that could have compromised vital and highly sensitive intelligence sources and methods, take this case out of the heartland. Therefore, a sentence outside the Guidelines range is warranted.

      1.   <u>Within the Guidelines Framework, Mr. Foggo's Service to the United States, Protection of Matters of National Security by Sparing the Government from the CIPA Process, and the Consequences on Future Employment Warrant Downward Departures Under U.S.S.G. § 5K2.0</u>

Alternatively, even if the court relied solely on the Guidelines, relevant Guideline calculations would support a sentence vastly different from the PSR's recommended offense level of 33, with a sentencing range of 135-168 months. To begin with, Mr. Foggo and the

12

government both agree with the PSR that the base offense level is 14. *See* Plea Agreement ¶ 5i. Second, both the government and Mr. Foggo agree to downward departures totaling 6 points pursuant to U.S.S.G. §3E1.1(a) and (b) and U.S.S.G. § 5K2.0(a)(2). Third, pursuant to 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0(a)(2), Mr. Foggo's service to the United States, protection of matters of national security, and consequences on future employment entitle Mr. Foggo to downward departures. Finally, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1), relevant loss or benefit calculations do not support an upward adjustment. As a result, the adjusted offense level is 6, thus supporting a sentence of probation.

As stated, Mr. Foggo and the government both agree with the PSR that a three-level downward departure from the offense level is warranted for acceptance of responsibility under U.S.S.G. §3E1.1(a) and (b).[3] The PSR failed to recognize any other departures.

In this case, Mr. Foggo and the government both agree that at least two factors warrant an additional two-level downward departure pursuant to § 5K2.0(a)(2): (1) Mr. Foggo's resignation from the office of the Executive Director of the CIA before searches of his home and officer were executed and before criminal charges were brought; and (2) his agreement to transfer venue from the Southern District of California to the Eastern District of Virginia, despite knowing that such a transfer would, and did, expose him to criminal liability for a broader range of conduct than could be charged in the Southern District of California. *See* Plea Agreement ¶ 5iii.

In accordance with U.S.S.G. § 5K2.0 and the Supreme Court's opinion in *United States v. Koon*, a court may depart from the Guidelines if it finds that mitigating factors, not otherwise

---

[3] We recognize that Mr. Foggo is entitled to a two-level downward adjustment for acceptance of responsibility and that the additional one-level downward adjustment is contingent upon the total adjusted offense level being 16 or higher. *See* Plea Agreement ¶ 5i.

prohibited by the Guidelines, are "present to an exceptional or in some other way make[ ] the case different from the ordinary case where the factor[s are] present." 518 U.S. 81, 96 (1996). In the instant case, three other mitigating factors warrant a downward departure: (1) Mr. Foggo's outstanding twenty-four years of service to the United States; (2) Mr. Foggo's protection of matters of national security by sparing the government from the Classified Information Procedures Act ("CIPA") process; and (3) the collateral employment consequences for Mr. Foggo. These factors are present to an exceptional degree in this case. *See Koon*, 518 U.S. at 96; U.S.S.G. § 5K2.0(a)(4). Here, Mr. Foggo's outstanding service to the United States is sufficiently extraordinary to justify a downward departure on that basis alone. However, when considered in conjunction with the other factors, Mr. Foggo's case is clearly outside the "heartland" of typical Guidelines cases. *Koon*, 518 U.S. at 96.

As discussed more fully in section A above and in the attached Classified Exhibit, Mr. Foggo has devoted much of his professional career at the CIA to protecting this nation's security. While the PSR glosses over Mr. Foggo's service to the United States and does not accurately reflect his achievements, no objective observer can deny that Mr. Foggo's contributions and record of service are extraordinary. His many colleagues who wrote letters on his behalf uniformly describe him as having a singular devotion to the CIA's mission and a unique ability to accomplish the agency's goals while providing strong and inspiring leadership to the personnel who served under him. The point is not that a public official involved in a crime should receive a "discount" at sentencing. Rather, such significant contributions, such as twenty-four years of exemplary service, constitute a mitigating factor that is truly "present to an exceptional degree," thus justifying a downward departure. *See e.g. United States v. Canova,* 412 F.3d 331, 358-59 (2d Cir. 2005) (district court did not abuse its discretion in granting a

14

downward departure for "extraordinary public service and good works," including service to country for six years); *U.S. v. Piccolo*, 282 F.3d 41, 43 n. 2 (1st Cir. 2002) (noting district court's exclusive reliance on "exemplary military record and his marijuana dependency" to warrant a downward departure); *U.S. v. Goodluck*, 1996 U.S. App. LEXIS 31328, at *3-4 (10th Cir. 1996) (acknowledging "defendant's conduct during the Gulf War and the medals he received" as "deserving of some consideration" in granting downward departure); *U.S. v. Wheeler*, 1990 U.S. App. LEXIS 20679, at *10 (6th Cir. 1990) (holding district court's downward departure for military history was not clearly erroneous).[4]

The Court should also consider the extent to which Mr. Foggo spared the government from the CIPA process. As this court is aware, based on the extensive initial CIPA filings, Mr. Foggos acceptance of the Plea Agreement spared the government and the Court from the need to conduct extremely difficult pretrial hearings. Such hearings, and Mr. Foggo's right to testify on his own behalf at a public trial, would have led to the disclosure of highly classified information related to the most sensitive missions of the CIA. Mr. Foggo's concern for the protection of CIA missions and personnel, as well as national security, was one of the reasons for his decision to plead guilty to Count I of the SSI.

---

[4] Other cases include: *United States v. Robinson*, 516 F.3d 716, 718-19 (8th Cir. 2008) (sentenced at the bottom of the guidelines range for twenty-five years of military service); *United States v. Benjamin*, 205 Fed. Appx. 30, 33 n. 2 (3d Cir. 2006) (granting downward departure for "extraordinary non-military, civic and community contributions"); *Gill v. U.S.*, 2008 U.S. Dist. LEXIS 43037, at *11 (E.D.N.C. June 2, 2008) (stating "the court sentenced [defendant] at the bottom of the Guideline Range in light of [defendant]'s significant military service"); *U.S. v. Paradies*, 14 F. Supp 2d 1315, 1322 (N.D. Ga. 1998) (holding service to country in the Air Force during World War II and the giving of time and money to numerous organizations supported a downward departure);*U.S. v. Caruso*, 814 F.Supp. 382, 384 (S.D.N.Y 1993) (holding age, military service, medical problems, good employment record, and likely compliance with the law, in totality, represent ground for downward departure).

It is also appropriate for the Court to consider the consequences on future employment to Mr. Foggo. At the end of Mr. Foggo's career at the CIA, he was the third-highest ranking official. If he had retired from the CIA, without incident, he would have pursued a successful career in the private sector. Now, it is unlikely that he will be able to use his skills in the same manner for gainful employment. He has effectively been denied employment and compensation commensurate with these unique skills and abilities. As evidenced by his current part-time position in a retail store, Mr. Foggo's ability to earn a living and support his family have been severely impacted. This impact will be felt by him for the rest of his life. In addition, his conviction will certainly prevent him from ever gaining a security clearance.[5] Further, because Mr. Foggo has been the object of so much negative media attention, it will be extremely controversial for any employer to hire him. Because Mr. Foggo's future employment opportunities are now so sharply circumscribed, a downward departure is appropriate. *See United States v. Jones,* 158 F.3d 492, 498-99 (10th Cir. 1998) (affirming downward departure based in part on the atypical "collateral employment consequences [the defendant] would suffer").

    2.  <u>Relevant Loss or Benefit Calculations Do Not Support an Upward Adjustment Under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)</u>

Pursuant to U.S.S.G. § 2C1.1(b)(2), adjustments for loss to the government from an offense is determined by the number of levels indicated by the Guidelines table in § 2B1.1. The PSR alleges a loss to the government of over $1 million. Based on this calculation alone, a

---

[5] Pursuant to the Plea Agreement, the government objects to any future government position that requires a security clearance, but takes no position on Mr. Foggo's ability to obtain a position requiring a security clearance with a private company. Nevertheless, Mr. Foggo's conviction will effectively prevent Mr. Foggo from gaining employment that requires a security clearance.

sixteen-level upward adjustment is applied to the base offense level of 14. *See* PSR, Worksheet A (Offense Level). The PSR attributes the calculated loss of over $1 million to the procurement contract described in Paragraphs 33 through 44 of the PSR. According to the PSR, the calculated loss to the government is "based on [the] much lower contract price" of the one-year contract that was awarded to another company upon the expiration of the Archer Logistics procurement contract. *See* PSR at ¶¶ 43-44. The PSR's loss calculation reflects the limitations placed upon the probation officer due to time constraints and security clearance issues. Clearly, the probation officer was unable to gain a full understanding of this unique procurement contract – the first of its kind entered into by the CIA – and how it actually aided the mission of the overseas location. In fact, the PSR incorrectly presumes that the CIA received no benefit from the procurement contract. The PSR's loss calculation is without basis, contrary to the evidence, and purely speculative.

First, the PSR concludes that the harm to the government is more than $1 million, despite both parties' assertion that the harm "is not readily ascertainable." If the harm is not calculable, even by the parties themselves, then the PSR's sixteen-level upward adjustment for a $1 million loss is purely speculative. Second, the probation officer's enhancement is grossly unfair, particularly since the plea agreement stipulates that the value of any benefits received by Mr. Foggo is less than $70,000. Third, the PSR's $1 million alleged loss to the government is, in essence, back door restitution, despite the agreement by the parties that restitution is not an issue in this case. Fourth, as the government acknowledges, the Procurement Contract was the first of its type. *See* Government's Objection to Presentence Investigation Report at 2. As such, calculating loss for the procurement contract is latent with speculation. Fifth, any calculations of loss must adequately take into account evidence reflected in the classified documents, which

were likely not made available to the probation officer, and which reflect a price for the

subsequent contract of $2,182,233 – not $382,223, as stated in the PSR. *See* PSR at ¶ 43; *see*

*also* Exhibit C, Subsequent Procurement Contract. This is a very serious error by the probation

officer. In fact, both the probation officer and the government base their loss calculations on the

base price of the successor contract, not the "total price for full performance" of the contract.

This is misleading, unfair, and incorrect. The "total price for full performance" set forth in the

successor contract was $2,182,233 (base price of $382,233 + supplies and shipping "not to

exceed" $1,800,000). Sixth, and even more importantly, contract pricing is dependent on a

number of variables and therefore contracts cannot be compared solely according to price.

Without comparing, among other things, (1) the actual terms of each contract, (2) the demand for

procurement services at the time each contract was executed, (3) the scope of the service

provided under each contract, and (4) the goods provided under each contract, it would be

impossible to determine whether the government actually suffered a loss – let alone calculate the

actual amount of any loss. In light of the highly-classified nature of the contracts and other

documents related to the Archer Logistics procurement contract, it is almost certain that the

probation officer was not provided with the information necessary to calculate a loss amount.

Even the government itself declared that "the Guidelines require proof of more before such an

overpayment may lead to an adjustment for "loss" under Guidelines § 2B1.1(b)." *See*

Government's Objection to Presentence Investigation Report.

     In fraud cases, the Fourth Circuit "squarely endorse[s] the use of intended loss rather than

just actual loss" when determining an adjustment for loss under Guidelines § 2B1.1(b). *U.S. v.*

*Miller*, 316 F.3d 495, 499 (4th Cir. 2003) (rejecting defendants assertion that actual loss over

intended loss should be used in mail fraud cases). The intended loss amount is based on the

defendant's subjective intent. *U.S. v. Merritt*, 102 Fed. Appx. 303, 310-11 (4th Cir. 2004); *see also Miller*, 316 F.3d 502-503; *U.S. v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("Intended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims."). Here, Mr. Foggo subjectively intended to expose the government to a loss totaling the amount of the 60% water contract markup. However, more important than choosing the actual versus the intended loss amount, is the calculation of loss. When *calculating loss*, the amount of "loss itself (whether actual or intended) is limited to the tangible economic loss to the victim." *U.S. v. Parsons*, 109 F.3d 1002, 1004-05 (4th Cir. 1997); *see also Merritt*, 102 Fed. Appx. at 310-11. Thus, when sentencing, the loss is "limited to the payment fraudulently obtained in excess of the amount…lawfully entitled." *Parsons*, 109 F.3d at 1004-05 (stating the proper measure for the amount of fraud loss is the "illegal profits" obtained "not the entire amount paid"). In *U.S. v. Castner*, 50 F.3d 1267, 1274-76 (4th Cir. 1995), the defendants overcharged the Navy by creating a second company to sell at a profit to the company holding the Navy contract. Under their "cost plus" contracts these higher prices or "costs" were passed on to the taxpayer and the government did not receive the benefit of paying a lower price. The Fourth Circuit found these inflated prices, which it termed "illegal profits," to be the proper measure of "amount of loss" under § 2B1.1. Here, applying *Parsons*'s method of calculating fraud loss, the amount of loss is limited to the 60% markup – or illegal profits – from the water contract.

The CIA/OIG case agent indicated that the loss related to this contract was less than $1,000. PSR § 31; SSI ¶ 24. Accordingly, pursuant to the table in § 2B1.1(b)(1)(A), a loss of "$5,000 or less" warrants "no increase" to the offense level.

Alternatively, in cases where the loss cannot reasonably be determined, the court will use

19

the gain that resulted from the offense as an alternative measure for Guidelines calculations. U.S.S.G. § 2B1.1 app. n.3(B). Here, the government argues that because loss cannot be determined, the Guidelines should be calculated based on the benefit – or gain – to Mr. Foggo. *See* Government's Objection to Presentence Investigation Report. However, even using the value of the benefits received by Mr. Foggo instead of the loss to the government as the appropriate measure for the Guidelines calculation, no upward adjustment is warranted. Pursuant to § 2C1.1(b)(2), the value of any benefits received by the defendant from an offense is increased by the number of levels from the Guidelines table in § 2B1.1. As the PSR notes "[Mr. Foggo,] the defendant did not benefit directly from any of the contracts that he steered to Brent Wilkes." PSR ¶ 52. The government, however, asserts that while Mr. Foggo did not receive any pecuniary benefits directly from alleged offenses, he did benefit in the form of family vacations to Scotland and Hawaii and dinners. These "benefits" must be put in their proper perspective. First, the Foggo family did accompany Mr. Wilkes on a private jet from the Overseas Location to Scotland. However, the Foggo family returned to the Overseas Location on a commercial flight, and Mr. Foggo reimbursed Mr. Wilkes for the cost of the return flight. In addition, there is evidence of documented expenses totaling over $2300.00, which the Foggo family incurred during this trip. Second, Mr. Wilkes did not pay for the Foggo family's airfare to and from Hawaii. The airfare was a home leave entitlement that was paid by the government. The Foggo's Hawaii vacation lasted approximately two weeks. During the first week, the Foggos paid for their own house rental. Mr. Foggo also paid for the family's rental car and incurred over $5800.00 in documented expenses during the vacation. Finally, the PSR and the Government ignores the fact that during Mr. Foggo and Mr. Wilkes thirty-year friendship, Mr. Foggo frequently treated Mr. Wilkes to dinners, offered Mr. Wilkes lodging in his home and covered

other expenses, particularly during times when Mr. Wilkes was not financially well-off. In addition, the evidence also demonstrates that Mr. Foggo purchased gifts for Mr. Wilkes and his family during the course of their friendship. Therefore, a sentence at the lower end of the Guidelines range, which includes probation, is warranted

D. A Sentence of Probation Would Satisfy the Purposes of Sentencing Under 18 U.S.C. § 3553(a)(2)

Turning to § 3553(a)(2), the Court must impose a sentence *sufficient, but not greater than necessary* to accomplish the goals of sentencing, including: (i) to reflect the seriousness of Mr. Foggo's offense, promote respect for justice and provide just punishment for the offense; (ii) to adequately deter criminal conduct; and (iii) to protect the public from further crimes of Mr. Foggo. Moreover, § 3553(a)(3) directs the Court to consider sentences other than imprisonment.

1. The Seriousness of the Offense & Just Punishment

Depriving United States citizens of honest services is a serious offense. Nevertheless, as the Court metes out "just punishment," we urge the Court not to overlook the punishment Mr. Foggo has already received, and stands to receive in the future, as a result of his conviction. To date, Mr. Foggo has suffered the loss of vocation, loss of reputation, loss of livelihood, and innumerable losses to his family. At the end of Mr. Foggo's career at the CIA, he was the third-highest ranking official. Had he retired without incident, he would have had the option to obtain a high-level, lucrative position in the private sector. Now, he no longer has those options. Mr. Foggo's career prospects have been severly impacted. His felony conviction makes it unlikely that he will ever work in government again, and he will certainly never obtain a security clearance. Mr. Foggo will never have the ability to gain employment or compensation commensurate with the unique skills and abilities he acquired in his twenty-four years of service

to the CIA. This will impact him for the rest of his life.

The personal penalties Mr. Foggo has incurred and the damage done to his reputation are legitimate considerations in fashioning a criminal sentence. *United States v. DiAmbrosio*, 2008 U.S. Dist. LEXIS 20963, at *14 (E.D.Pa. Mar. 13, 2008) (imposing five year probation, reasoning in part that the defendant, "already has paid a heavy price for his offense," including loss of job, barred from industry in which he was skilled, family and marriage losses, and fines); *see also United States v. Anderson*, 267 Fed. Appx. 847, 850 (11th Cir. 2008) (upholding below-Guidelines probationary sentence in light of reputational damage and exposure to civil liability). The negative press coverage has forever tainted Mr. Foggo's reputation. As a result, his ability to earn a living and support his family have been severely impacted. The Court should consider these negative employment consequences to ensure that Mr. Foggo's punishment is not "greater than necessary." *DiAmbrosio*, 2008 U.S. Dist. LEXIS 20963, at *13.

   2. A Sentence of Probation Will Adequately Deter Future Criminal Conduct and Promote Respect for the Law

With respect to deterrence, Mr. Foggo endured a very public fall from grace, beginning with his resignation from the CIA. These dire consequences are likely enough to warn the public – and high-ranking government officials in particular – that it is important not to engage in fraudulent behavior. Moreover, given Mr. Foggo's entering of a plea agreement to protect matters of national security, anything other than a substantially-reduced sentence will discourage others from cooperating in the future and will have a negative effect on the prosecution of other high-profile government officials. In this light, it is not necessary to incarcerate Mr. Foggo to promote respect for the law or to serve the interests of general deterrence.

### 3. Mr. Foggo Does Not Pose A Threat to Society

As the parties agreed, Mr. Foggo is in Criminal History Category I. *See* Plea Agreement ¶ 5iv. He has no prior criminal history and has led an otherwise upstanding, exemplary life. There is therefore no basis to conclude that he is likely to commit any crimes in the future. For the same reason, the public does not need to be protected from him.

The Government's Objections note an incident of assault allegedly perpetuated by Mr. Foggo while in an overseas location over twenty years ago. This incident has no merit. While Mr. Foggo was stationed overseas, an altercation arose between Mr. Foggo and a bicyclist who hit Mr. Foggo's car with either his hand or his bike. The incident was investigated by the foreign ministry, local police, and internally by the CIA. In the end, Mr. Foggo's name was cleared and he remained at his overseas post for several years.

### E. A Sentence of Probation Meets the Requirements of 18 U.S.C. § 3553(a)(3)

Section § 3553(a)(3) directs the Court to consider sentences other than imprisonment. *See also Gall*, 128 S. Ct. at 602. This affirms the court's flexibility to impose sentences "dictated by the facts of the case" and not dictated by rigid adherence to the Guidelines. *Gall*, 128 S. Ct. at 602 (affirming sentence of probation despite the Guidelines range pursuant to § 3553(a)(3)). As such, probation is an appropriate sentence when the facts of the case and mitigating evidence supports its imposition. *Id.* Here, a sentence of probation is an available and warranted means of punishment. As discussed above, the unique facts of the case and the unique contributions of this man, including the negative employment consequences and the impact on his family circumstances, present compelling mitigating evidence that supports a sentence of probation. Further, imposing a sentence of probation on Mr. Foggo would adequately reflect the express purposes of sentencing as outlined in Section D.

F.  A Sentence Within the Guidelines Range Would Be Unjustly Severe Compared to the Sentences Imposed in Related Cases and Would Create an Unwarranted Sentence Disparity Under 18 U.S.C. § 3553(a)(6)

Under § 3553(a)(6), courts must avoid unwarranted sentence disparities with those of similar conduct. The imposition of the PSR's recommended Guidelines term of imprisonment of 135-168 months, or even the Plea Agreement level of no more than 37 months, would result in an unjustly severe sentence when compared to the sentences received by defendants in related cases. If Mr. Foggo were sentenced within the PSR range or at the upper limits of the Plea Agreement, he would be punished as severely or even more severely than Messrs. Cunningham, Wilkes and Wade – who were sentenced to 100 months, 144 months and 30 months respectively – despite the significant differences between Mr. Foggo's conduct and the conduct of these other individuals.

Mr. Foggo does not dispute that he broke the law. But, Mr. Foggo accepted responsibility for his conduct and spared the government from the CIPA process, which would have disclosed classified information vital to his defense. Mr. Foggo's offense conduct was not related to the investigation of Congressman Cunningham, which ultimately led to the return of the separate indictment against Mr. Wilkes. In addition, Mr. Foggo was not charged with any crimes related to the Cunningham investigation. According to the government, there is no evidence of Mr. Foggo's involvement with the conspiracy between Congressman Cunningham and Mr. Wilkes. The clear contrast between Mr. Foggo's conduct and that of each of these individuals justifies the imposition of a sentence both far below the Guidelines range in this case and considerably less than the sentences imposed on Messrs. Cunningham, Wilkes, and Wade. See, e.g., Gall, 128 S. Ct. at 600 (approving district court's consideration under § 3553(a) of the need to avoid unwarranted similarities among co-conspirators who were not similarly situated).

24

Aside from the sentences imposed in related cases, the imposition of a non-Guidelines sentence of Mr. Foggo will "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  First, high profile government officials in other public corruption or breach of honest services cases have received sentences significantly below Mr. Foggo's Guidelines or Plea Agreement range. Lewis Libby, Chief of Staff to Vice President Dick Cheney, was sentenced to 30 months for perjury and obstruction of justice in connection with the Plame Affair.[6]  Mr. Libby's sentence was later commuted.[7]  Robert Ney, U.S. Representative, served 17 months after receiving in excess of $170,000, not including skybox seats, campaign contributions, and expensive meals, in connection with the Jack Abramoff Scandal.[8]  Webster Hubbell, U.S. Associate Attorney General, served 16 months after he pled guilty to mail fraud and tax evasion in connection with amounts totaling $482,410.82.[9]  Catalina V. Villalpando, U.S. Treasurer, was sentenced to 4

---

[6] *Libby Sentenced to 30 Months in Prison*, CNN.COM, June 5, 2007, http://www.cnn.com/2007/POLITICS/06/05/cia.leak.trial/index.html.

[7] George W. Bush, U.S. President, Statement by the President on Executive Clemency for Lewis Libby (July 2, 2007), http://www.whitehouse.gov/news/releases/2007/07/20070702-4.html.

[8] Jackie Kucinich, *Ney: Abuses Will Continue Despite New Ethics Rule*, THE HILL, Aug. 20, 2008, http://thehill.com/leading-the-news/ney-abuses-will-continue-despite-new-ethics-law-2008-08-20.html; Susan Schmidt and  James V. Grimaldi, *Ney Sentenced to 30 Months in Prison for Abramoff Deals*, THE WASHINGTON POST, Jan. 20, 2007, A03, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/01/19/AR2007011900162.html; Press Release, Dep't of Justice, Congressman Robert W. Ney Agrees to Plead Guilty to Charges Involving Corruption and False Statements (Sept. 15, 2006), http://www.usdoj.gov/opa/pr/2006/September/06_crm_622.html.

[9] Ashby Jones, *Lerach Reports to Prison...A Look at What Awaits*, THE WALL STREET JOURNAL, May 19, 2008, http://blogs.wsj.com/law/2008/05/19/as-bill-lerach-reports-to-prison-a-look-at-what-awaits/; Jeff Gerth, *Ex-Clinton Confidant Gets 21 Months*, THE NEW YORK TIMES, June 29, 1995, http://query.nytimes.com/gst/fullpage.html?res=990CE6D8163DF93AA15755C0A963958260&sec=&spon=&pagewanted=all.

25

months and 3 years probation after she pled guilty to tax evasion for amounts totaling $161,983 and obstruction of justice.[10]  John Poindexter, National Security Advisor, was sentenced to 6 months for conspiracy, obstruction of justice and false statements to Congress in connection with the Iran-Contra Affair.[11]  Poindexter's conviction was later overturned.[12]  Lt. Colonel Oliver North, National Security Council Staff, was sentenced to 3 years suspended prison term and 2 years probation for illegal gratuity, aiding and abetting in the obstruction of a congressional inquiry, and destruction of documents in connection to the Iran-Contra Affair.[13]  Lt. Colonel North's conviction was later vacated.[14]  James Watt, Secretary of Interior, was sentenced to 5 years probation after pleading guilty to perjury and obstruction of justice for receiving more than $500,000 in connection with the HUD scandal.[15]  Second, Mr. Foggo's Criminal History of Category I weighs in favor of a downward variance.  Because Mr. Foggo has no prior criminal history this should be considered in his favor.

## Conclusion

The unique nature and circumstances of this offense warrant a sentence of probation under § 3553(a).  Mr. Foggo has acknowledged the seriousness of the crime to which he pled

---

[10] *Former United States Treasurer Gets Prison Term for Tax Fraud*, THE NEW YORK TIMES, Sept. 14, 1994, http://query.nytimes.com/gst/fullpage.html?res=9402EEDC153BF937A2575AC0A962958260&sec=&spon=.

[11] Joe Pichirallo, *Poindexter Gets 6 Months in Prison; Ex-Reagan Aide Sentenced for Lying to Congress on Iran-Contra Affair*, THE WASHINGTON POST, June 12, 1990, A1.

[12] *Id.*

[13] David Johnston, *The Punishment of Oliver North*, THE NEW YORK TIMES, July 9, 1989, http://query.nytimes.com/gst/fullpage.html?res=950DE1D6123BF93AA35754C0A96F948260.

[14] *A North Conviction Overturned on Appeal 2-1 Decision Faults Instructions to Jury*, THE BOSTON GLOBE, July 21, 1990.

[15] *James Watt Draws A Fine But Not Jail*, THE NEW YORK TIMES, Mar. 18, 1996, http://query.nytimes.com/gst/fullpage.html?res=9B04E1D81639F930A25750C0A960958260.

guilty. At the same time, however, Mr. Foggo is a man who has inspired loyalty and devotion in his family members, his colleagues, and his friends, and who has made substantial contributions to the United States. The Supreme Court has made clear that under the new sentencing regime, a court should consider all the § 3553(a) sentencing factors, giving no more weight to one factor than to any other factor. Therefore, Mr. Foggo respectfully requests that the Court sentence him on the basis of all the § 3553(a) factors, rather than on the basis of strict adherence to the Guidelines or some incomplete or distorted portrait of him presented in the Presentence Investigation Report (PSR). Mr. Foggo also respectfully requests that this Court take into account his twenty-four years of distinguished service to the United States, his acceptance of responsibility, his protection of matters of national security by sparing the government from the CIPA process, and the collateral consequences to Mr. Foggo. In light of these factors and the goals of § 3553(a), incarceration for Mr. Foggo would be a "greater than necessary" punishment in this case. A sentence of probation, perhaps combined with community service alternatives, would allow Mr. Foggo to continue serving the public interest and would still promote respect for the law.

Dated: February 13, 2009

By: _____

David A. Rappaport
Virginia Bar No. 66701
*Counsel for Defendant Kyle Dustin Foggo*
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: 202.887.4000
Facsimile: 202.887.4288
E-mail: drappaport@akingump.com

27

Mark J. MacDougall, *pro hac vice*
W. Randolph Teslik, P.C., *pro hac vice*
Paul W. Butler, *pro hac vice*
*Counsel for Defendant Kyle Dustin Foggo*
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

## CERTIFICATE OF SERVICE

I hereby certify that on this day 13th of February, 2009, I caused a copy of the foregoing Defendant Kyle Dustin Foggo's Sentencing Memorandum to be served by electronic mail and by hand upon the following parties:

James P. Gillis
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
james.p.gillis@usdoj.gov


Jason A. Forge
Valerie Chu
Phillip L.B. Halpern
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101-8893
(609) 557-7042
jason.forge@usdoj.gov
valerie.chu@usdoj.gov

*Counsel for the United States of America*


David A. Rappaport
Virginia Bar No. 66701
*Counsel for Defendant Kyle Dustin Foggo*
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: 202.887.4000
Facsimile: 202.887.4288
E-mail: drappaport@akingump.com